**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DOMINICK R. VOSO, )<br><br>Plaintiff, )<br><br>v. )<br><br>SHARON TERESA EWTON, KENNETH FRANK, and )<br>FREDERIC W. FRANK, III, )<br><br>Defendants. )<br>—————————————————————— )<br><br>SHARON TERESA EWTON, KENNETH FRANK, )<br>FREDERIC W. FRANK, III, and MATTHEW G. SMITH, )<br><br>Counter-Plaintiffs, )<br>v. )<br><br>DOMINICK R. VOSO and PURSUIT BEVERAGE )<br>COMPANY, LLC, )<br><br>Counter-Defendants. ) | No. 16-cv-00190 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Sharon Teresa Ewton ("Ewton"), Kenneth Frank ("Ken Frank"), Frederic W. Frank

("Rick Frank"), and Matthew Smith ("Smith") (collectively, "Counter-Plaintiffs") filed an

emergency motion for the appointment of a receiver over Pursuit Beverage Company, LLC

("Pursuit") on February 22, 2016. (R.14). Specifically, Counter-Plaintiffs seek to appoint

Bennett Kaplan ("Kaplan"), Managing Director of Axium Consulting, to manage Pursuit

pending this litigation. Counter-Defendants Dominick R. Voso ("Voso") and Pursuit oppose this

request. (R.28). The Court held an evidentiary hearing on this motion on March 11 and 29,

2016. For the following reasons, the Court denies Counter-Plaintiffs' motion for a full

receivership. The Court directs Counter-Defendants, however, to institute the remedial measures discussed herein for the pendency of this litigation.

## LEGAL STANDARD

"Federal courts have an inherent equitable power to appoint a receiver to manage . . . assets during the pendency of litigation." *Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994); *see also* Fed.R.Civ.P. 66 (specifically allowing for the appointment of a receiver). While receivership may be appropriate "in cases involving fraud and the possible dissipation of assets[,]"*McGaughey*, 24 F.3d at 907, courts grant such relief only under "extraordinary" circumstances. *JPMorgan Chase Bank, N.A. v. Heritage Nursing Care, Inc.*, No. 06 C 4803, 2007 WL 2608827, at *8 (N.D. Ill. Sept. 6, 2007). The Seventh Circuit has viewed receivership as "a drastic, harsh and dangerous" remedy that "should be exercised with care and caution." *Connolly v. Gishwiller*, 162 F.2d 428, 435 (7th Cir. 1947).

"The party seeking a receiver must first show that he or she has some legally recognized right in that property that amounts to more than a mere claim against [the opposing party]." *JPMorgan Chase Bank*, 2007 WL 2608827 at *8. Thus, secured creditors and stockholders may have interests warranting receiver appointment, but simple contract creditors do not. 12 Wright & Miller, Fed. Prac. & Proc. § 2983.

In determining whether to appoint a receiver, courts consider several factors, including: (1) fraudulent conduct on the part of the opposing party; (2) imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (3) inadequacy of available legal remedies; (4) probability that harm to the moving party would be greater than injury to the opposing party; and (5) the moving party's probable success in the action and the possibility of irreparable injury to his interests in the property. *JPMorgan Chase Bank*, 2007 WL 2608827 at *9.

Courts also may consider "less severe remedies" in lieu of a full receivership. *See Dixon v. Barry*, 967 F. Supp. 535, 554 (D.D.C. 1997) (appointing full receiver only after other oversight measures failed to result in compliance with court order); *Miller v. Up in Smoke, Inc.*, No. 1:09-CV-242, 2010 WL 5095812, at *7 (N.D. Ind. Dec. 8, 2010) (appointing full receiver to manage corporate assets only after court-appointed overseer proved ineffective); *see also JPMorgan Chase Bank*, 2007 WL 2608827 at *8 (noting that an equitable receiver may have active management duties, or passive reporting duties). Courts, for example, may order a corporate audit when considering a receivership request. *See Macon Lumber Co. v. Bishop & Collins*, 229 F.2d 305, 306 (6th Cir. 1956) (affirming trial court instructions).

## STATEMENT OF FACTS

### I.     Factual Background

The Court held an evidentiary hearing on this receivership motion on March 11 and 29, 2016. During the course of the hearing, Defendants called the following witnesses to testify: Defendant Rick Frank, non-party Richard Flynn ("Flynn"), and non-party Amanda Malusky Krauss ("Krauss"). Plaintiff called the following witnesses: Plaintiff Dominick Voso, Defendant Ken Frank, non-party Jenny Copenharve ("Copenharve"), and non-party Warren Spencer ("Spencer"). The Court carefully evaluated the credibility of each witness who testified at the hearing, including body language, tone of voice, facial expressions, mannerisms, and other indicative factors. Both sides also introduced numerous documents at the hearing. In considering this motion, the Court looks to the following facts drawn from the hearing.

#### A.     2011 – 2013

After leaving his development position at Quizno's, Plaintiff Voso became interested in the market for energy drinks. (R.28-1, Voso Aff. ¶¶ 3-4). In 2011, he secured a license to distribute Bomb Energy drinks in the United States. (*Id.* ¶¶ 5-8). This endeavor proved

unsuccessful.  (*Id.*)  Voso switched his focus to canned energy drinks, forming Pursuit Energy LLC ("Pursuit Energy") along with his ex-brother-in-law Robert Aslan ("Aslan") and a colleague, Randy Jacobson.  (R.35-1, Voso Dep. Tr. at 18-20).

In July 2012, Pursuit Energy entered into an "exclusive license agreement" with Mossy Oak—an outdoor lifestyle apparel company—to put Mossy Oak's camouflage brand on its energy drinks.  (R.28-1, Voso Aff. ¶¶ 15-16).  Mossy Oak subsequently terminated this licensing agreement because Pursuit Energy failed to pay a quarterly royalty.  (Defs.' Ex. 43, Notice of Termination; 3/11 Voso Hearing Testimony at 300-02).  After an unsuccessful product launch in mid-2013, Pursuit Energy failed.  (R.35-1, Voso Dep. Tr. at 21).  Voso then formed Pursuit—an Illinois limited liability company—on June 1, 2013, serving as its sole member and manager.  (R.28-1, Voso Aff. ¶¶ 20-21).  Voso executed a new licensing agreement with Mossy Oak in January 2014.  (*Id.* ¶ 25; Defs.' Ex. 42).

To fund Pursuit, Voso borrowed from "personal friends, friends of friends."  (3/11 Voso Hearing Testimony at 304; 3/29 Hearing Testimony at 425-26, 448).[1]  Voso led Rick Frank to believe, however, that he had personally contributed approximately $1.5 million to Pursuit.  (3/11 Rick Frank Hearing Testimony at 15-16, 33-34, 50).  Pursuit's 2014 tax form also reflects

---

[1]  At his deposition, Voso testified that Pursuit's initial funding came from his ex-wife, Dayna Aslan Voso ("Dayna"), his current girlfriend, Ronnie Ferrari ("Ronnie"), and Aslan.  (R.35-1, Voso Dep. Tr. at 36-40).  He testified that he did not have loan documents reflecting Dayna and Ronnie's contributions; he could not recall with respect to Aslan's contribution.  (*Id.*).  At the hearing, Defendants introduced loan agreements subpoenaed from Dayna and Aslan.  (Defs.' Exs. 68, 73).  These documents, dated from 2014, reflect that Dayna and Aslan loaned money to Bomb Energy and Pursuit Energy -- not Pursuit.  They further entitle Dayna and Aslan to principal payments, royalty payments, and/or a cash distribution upon the sale of the company ($1 million to Aslan, $2 million to Dayna).  *See id.*  The Court notes that Ronnie's checks also reflect payments to Bomb Energy and/or Pursuit Energy -- *not* Pursuit.  (Defs.' Ex. 74).

Voso's annual capital contribution as $1.3 million. (Defs.' Ex. 2).[2]  In marked contrast, Voso's

October 2012 bankruptcy petition recorded his personal assets at only $5,300. (Defs.' Ex. 8).

Indeed, Voso admitted that there "was none of [his] own money in the company" -- a fact which

he "did not disclose . . . to a single investor." (3/29 Voso Hearing Testimony at 417-18).

### B.    Late 2013 – Mid-2014

Mutual acquaintances, Roger Long and Robert Williams ("Williams"), introduced Voso

to Ken Frank around October or November, 2013. (3/11 Voso Hearing Testimony at 306-08).

Voso and Ken Frank discussed investment and growth opportunities for Pursuit. Ken Frank

suggested that his brother, Rick Frank, and his brother's wife (Ewton) might be interested in an

investment. (R.16-1, Ken Frank Aff. ¶¶ 8-13; R.28-1, Voso Aff. ¶ 30). Ken Frank claims that

Voso met with himself, Rick Frank, and Ewton in Florida in December 2013, at which point

Voso discussed Pursuit's financials—including alleged contracts with Walmart and Michael

Jordan—and requested a $250,000 loan. (R.16-1, Ken Frank Aff. ¶¶ 15-21). Rick Frank

likewise testified to this in-person meeting at his home in Merritt Island, Florida, although he

recalled it taking place in January 2014, not December 2013. (3/11 Rick Frank Hearing

Testimony at 14-15, 47). Rick Frank testified that Voso talked about, among other things,

"Walmart and Michael Jordan." (*Id.*). Voso denies this in-person meeting and denies discussing

those business partnerships, but agrees that he had "several telephone discussions with [Ken]

Frank and Rick Frank" during late 2013. (R.28-1, Voso Aff. ¶¶ 31-32, 44-47; *see also* 3/11

Voso Hearing Testimony at 311-12).

According to Rick Frank, he and his wife decided to loan Voso $125,000—not the full

$250,000—because they "had a very nice meeting" with Voso, but "wanted to see what he was

---

[2]  Voso testified that his former accountant devised the $1.3 million figure by valuing many
factors, including intellectual property. (3/29 Voso Hearing Testimony at 348-49).

all about." (3/11 Rick Frank Hearing Testimony at 16, 51). Thus, on January 15, 2014, Ewton loaned Pursuit $125,000, as memorialized by an Investment Agreement (the "First Investment Agreement"). (R.28-1, Voso Aff. ¶¶ 35-36; R.16-1, Ken Frank Aff. ¶¶ 22-29; Defs.' Ex. 33). The First Investment Agreement "did not provide Ewton with any equity or membership interest in Pursuit." (R.17, Answer ¶ 14). Rick Frank admitted that he did not conduct any independent investigation of either Voso or Pursuit prior to extending this loan, noting, "We take a lot of people for face value." (3/11 Rick Frank Hearing Testimony at 61).[3] Rick Frank also knew, in January 2014, that Pursuit had no sales. (*Id.* at 53).

Ken Frank began working as Pursuit's Director of Sales in January 2014. (R.28-1, Voso Aff. ¶ 38). Pursuit made its first production run in February 2014. (3/11 Voso Hearing Testimony at 311). According to Voso, sales throughout the period of February – August 2014 were "flat" and "slow," generating $250,000 in revenue. (*Id.* at 313-17). Ken Frank agreed that Pursuit's initial sales "weren't great" because they had missed the opportunity to sell to large chain stores. (3/29 Ken Frank Hearing Testimony at 531).

By August 2014, Pursuit needed additional capital. Thus, after a face-to-face meeting in Florida on August 28, Ewton loaned Pursuit an additional $75,000 pursuant to an Investment Agreement dated September 2, 2014 (the "Second Investment Agreement"). (R.28-1, Voso Aff. ¶¶ 50-54; R.16-1, Ken Frank Aff. ¶¶ 34-42; Defs.' Ex. 44; R.36-2). Voso and Ewton executed this agreement. (R.36-2 at 6). The Second Investment Agreement rolled in the original $125,000 loan, increased Ewton's royalty interest, and contemplated that Ewton "will receive ownership of 7.5%" of Pursuit in exchange for her loans. (*Id.* at § 3.2.3 ("*Company Ownership* .

---

[3]  Both Frank brothers testified that they would not have invested with Voso had they known of his October 2012 bankruptcy. (3/11 Rick Frank Hearing Testimony at 60-61; 3/29 Ken Frank Hearing Testimony at 542). Both acknowledged that they could have discovered the bankruptcy before investing in Pursuit if they had conducted any due diligence of Voso. (*See id.*).

. . 7.5% . . . operating agreement and ownership papers shall be forth coming"); *see also* R.28-1,

Voso Aff. ¶ 55).[4]  The Second Investment Agreement makes no mention of compensation to

Voso, nor does it reference any operating agreement terms.  (*See* R.36-2).  Defendants did not

receive a draft operating agreement until late December 2014.  (Defs.' Ex. 41; *see* 3/11 Rick

Frank Hearing Testimony at 23).  According to Voso, Defendants never provided feedback on

the draft operating agreement, and never asked for a finalized operating agreement.  (3/29 Voso

Hearing Testimony at 341-43).

### C.  Late 2014

According to Voso, he received a call from Ken Frank in late September 2014, stating

that his brother and Ewton planned to sell their landscaping business and wanted to increase their

investment in Pursuit.  (3/11 Voso Hearing Testimony at 319-20).[5]  Rick Frank, however,

testified that Voso approached them (not the other way around), requesting additional short-term

loans for promotions and production.  (3/11 Rick Frank Hearing Testimony at 20-21).

Documents corroborate Rick Frank's testimony.  On October 20, 2014, for example, Voso sent

Ewton and Rick Frank an e-mail, discussing a Gander Mountain promotion order and asking,

"Would there be any way you guys could front us the 40k for 2 weeks? . . . Like I said I hate to

ask . . . It's only because we are partners that I would ever ask, when we have no one else to turn

to."  (R.39-2 at 3).  Similarly, on December 1, 2014, Voso thanked Ewton and Rick Frank for

"helping this one last time with our cash flow deficiencies. . . ."  (*Id.* at 4).

In any event, the parties do not dispute that Ewton gave Pursuit $40,000 in October 2014

and $30,000 in December 2014, bringing her total investment to $270,000.  (R.16-1, Ken Frank

---

[4]  As Voso testified, Rick Frank and Ewton "decided that a small equity piece would be
warranted, and I agreed."  (3/11 Voso Hearing Testimony at 318-19).
[5]  Voso claims that, around October 1, 2014, he offered to convert Ewton's existing debt to
equity if she committed to a $500,000 total investment.  (R.28-1, Voso Aff. ¶¶ 56-57).

Aff. ¶¶ 44-52; R.28-1, Voso Aff. ¶¶ 58-59). The parties also do not dispute that neither Ewton nor Rick Frank had conducted any due diligence on Voso up to this point, beyond taking Voso at "face value." (3/11 Rick Frank Hearing Testimony at 51-52, 61 (testifying that, "having seen what [Voso] was all about," Ewton loaned him $125,000, then $75,000, then $30,000, and then $40,000); *see also* 3/29 Ken Frank Hearing Testimony at 542).

Voso met with Defendants in Florida in December 2014.[6] Voso requested an additional $230,000 in exchange for converting the existing loan amounts into a 25% equity share – 20% to Ewton, and 5% to Ken Frank. (R.16-1, Ken Frank. Aff. ¶¶ 55-56; *see also* 3/11 Rick Frank Hearing Testimony at 23; Defs.' Ex. 6, Dec. 1, 2014 e-mail from Voso to Ewton and Rick Frank (memorializing ongoing discussions about "becoming a 20% equity partner")). Voso hired Rick Frank's son ("Rick Jr.") and another associate (Mark Baines) as part of this arrangement. (R.28-1, Voso Aff. ¶¶ 61-70; 3/29 Ken Frank Hearing Testimony at 538-39 (acknowledging quid pro quo); Defs.' Ex. 6, Dec. 1, 2014 e-mail ("and as part of that we will extend Rick Jr. a job offer to work under Kenny")).

Defendants agreed to this arrangement but did not finalize any paperwork. (R.16-1, Ken Frank. Aff. ¶¶ 59-61). Ewton did not give any of the requested $230,000 at this time. (R.38-3, Ewton Aff. ¶ 9; R.28-1, Voso Aff. ¶ 64).

---

[6] Voso also met Counter-Plaintiff Smith, a friend of Rick Frank who had "experience with logistics," at this December 2014 meeting. (R.28-1, Voso Aff. ¶ 62). Smith claims that, in February 2015, he invested $25,000 in Pursuit in exchange for a 1–5% membership interest. (R.17, Counterclaims ¶¶ 98-100). Voso does not deny that Smith "became a member" of Pursuit. (R.28-1, Voso Aff. ¶ 101). According to Smith, he became frustrated with Voso and demanded his money back in April 2015. (R.17, Counterclaims ¶¶ 106-07). In July 2015, Pursuit's corporate attorneys, Scott Friedman ("Friedman") and Michael Lightfoot ("Lightfoot"), contacted Smith to discuss the return of his $25,000 investment. In connection with this discussion, Smith alleges, Friedman and Lightfoot furnished fraudulent financial documents and made other misrepresentations concerning Pursuit's financial health. (*Id.* ¶¶ 108-14).

There is no dispute that Defendants received a draft Operating Agreement dated December 31, 2014 (the "December 2014 Operating Agreement"), but they did not question or sign it or any other written instrument. (*See* R.16-1, Ken Frank. Aff. ¶ 61; 3/11 Rick Frank Hearing Testimony at 23, 56-60).[7] The December 2014 Operating Agreement named Voso as sole manager, gave him the authority to conduct Pursuit's day-to-day business, and entitled him to compensation under a separate Management Agreement. (Defs.' Ex. 41 at §§ 4.1, 4.3, 4.5). Rick Frank testified that he had never seen the Management Agreement. (3/11 Rick Frank Hearing Testimony at 60). Voso had purportedly assured him, though, that he was not taking a salary. (*Id.* at 16, 48-50 (unable to recall specific dates of these assurances); *see also* R.38-3, Ewton Aff. ¶ 16). In fact, Voso took home approximately $130,000 in 2014. (3/29 Voso Hearing Testimony at 481).

By the end of 2014, Pursuit had recorded approximately $750,000 in sales, operating at a net loss of approximately $600,000. (Defs.' Ex. 2, 2014 Pursuit Tax Form; 3/29 Voso Hearing Testimony at 347-48; 3/29 Ken Frank Hearing Testimony at 544). Voso sent Ewton Pursuit's 2014 financial statements in January 2015. (Defs.' Ex. 13). He also sent Ewton and Ken Frank K-1 forms, reflecting Ewton's $270,000 capital contribution and 2014 membership interest in Pursuit. (Defs.' Ex. 2, 2014 Pursuit Tax Form at 17, 19).[8] Indeed, Voso testified that he always intended for Ewton and Ken Frank to become members. (3/29 Voso Hearing Testimony at 362;

---

[7] Rick Frank testified that, prior to receiving the December 2014 Operating Agreement, he received "proposed operating agreements, but nothing with ever a salary [for Voso] or anything like that in it." (3/11 Rick Frank Hearing Testimony at 57-58). He could not, however, point out where those "proposed operating agreements" were in the record. (*Id.*). Further, he had previously identified the December 2014 Operating Agreement as "the first operating agreement we ever received from Mr. Voso." (*Id.* at 23).

[8] Ewton's 12.5% figure represented "her pro-rata share of the 20 percent in 2014." (R.35-1, Voso Dep. Tr. at 67:15-23).

*see also* R.28-1, Voso Aff. ¶ 95 (stating that he sent the K-1 forms on "the advice of Pursuit's accountant" based on his membership intent)).  Rick Frank did not know if Ewton or Ken Frank had relied on these K-1s to take a tax deduction in 2014.  (3/11 Rick Frank Hearing Testimony at 64-65).

### D.    Early – Mid-2015

Due to other commitments, Ewton could not immediately fulfill her remaining $230,000 capital contribution.  (3/11 Rick Frank Hearing Testimony at 24-25; Defs.' Ex. 6, e-mails dated Mar. 7, 2015 through Apr. 1, 2015; R.38-3, Ewton Aff. ¶¶ 8-10).  Ken Frank agreed that, by early spring 2015, Voso had expressed frustration with the pace of Ewton's contribution and with Frank's sales practices.  (3/29 Ken Frank Hearing Testimony at 535).  Voso, in turn, claims that Ken Frank had become "increasingly hostile" towards him.  (R.28-1, Voso Aff. ¶ 83).

Ewton eventually fulfilled her $230,000 contribution in late April 2015, bringing her total investment in Pursuit to $500,000.  (R.16-1, Ken Frank Aff. ¶¶ 62-76; 28-1, Voso Aff. ¶ 86).  Accordingly, Voso "instructed Pursuit's attorneys to deliver the relevant documents to finalize the proposed debt-to-equity transaction and to work with Ewton."  (R.28-1, Voso Aff. ¶ 87).  Voso's attorney sent Ewton a subscription agreement on May 27, 2015.  (Defs.' Ex. 45, Subscription Agreement attaching Operating Agreement; 3/11 Rick Frank Hearing Testimony at 74-75).  Schedule 1 to this Operating Agreement (the "May 2015 Operating Agreement") indicated membership interests "as of May 1, 2015" as:  Voso (74%), Ewton (20%), Ken Frank (5%) and Smith (1%).  (Defs.' Ex. 45; *see also* Defs.' Ex. 19 (same)).

The May 2015 Operating Agreement again named Voso as managing member, granting him the authority to "direct, manage and control the business," including the power "to issue additional Membership Interests as [he] deems appropriate," so long as 51% of the membership

shares approved the admission of additional members.  (*Id.* at §§ 3.1, 3.3, 7.1, 8.1, 9.1).[9]  The

May 2015 Operating Agreement also authorized Voso to receive "a salary of $200,000 per year

(with annual raises of 3% per annum), an annual automobile and health care allowance of

$30,000, and an intellectual property allowance of $25,000."  (*Id.* at § 5.3(c)).

Upset about the terms of Voso's compensation, Rick Frank contacted his attorney in late

May 2015.  (3/11 Rick Frank Hearing Testimony at 26-30; 61-63).  He testified, "We looked

through [the May 2015 Operating Agreement] and once I got to the part about [Voso] taking

what he wants to get paid, that's when we did not move any further with it."  (*Id.* at 75).

Defendants never executed any Pursuit operating agreement.  (*Id.* at 23-24).  According to Voso,

Ewton and Ken Frank refused to sign the adoption certificates approving the operating

agreement and, thus, Ewton's debt-to-equity transaction never officially closed.  (R.28-1, Voso

Aff. ¶¶ 96-100; R.1, Compl. ¶ 17).

Around May 2015—after learning that Voso had borrowed $100,000 from another

investor without consultation or disclosure—Ken Frank "became uncomfortable with Voso's

management[.]"  (R.16-1, Ken Frank Aff. ¶¶ 79-81).  Voso, the Frank brothers, and Smith met

for dinner on May 28, 2015, where Rick Frank questioned Voso about Pursuit's business and

Voso's leadership.  (*Id*. ¶¶ 82-84; R.28-1, Voso Aff. ¶¶ 88-92).  Voso and Smith, in turn,

criticized Ken Frank's sales performance.  (3/29 Voso Hearing Testimony at 381-83; 3/29 Ken

Frank Hearing Testimony at 535-36).

After this confrontation and continuing throughout the summer months, Voso allegedly

argued with Ken Frank, telling him that he (Voso) "would be going on the offensive" and that

Pursuit's assets were "[his] money," and that he "could do what [he] wanted with [his] money."

---

[9]  The related Voting Trust further "provide[d] the Manager with additional control and decision
making capacity for any matters contained in the current Operating Agreement[.]"  (*Id*).

(R.16-1, Ken Frank Aff. ¶¶ 85-93).  Voso also made alleged threats with his shotgun.  (*Id.* ¶¶ 92-93).[10]  Voso testified that at least one of these threats was a joke.  (R.28-1, Voso Aff. ¶ 80; R.35-1, Voso Dep. Tr. at 178:12-13).

### E.  Mid – Late 2015

Around July 2015, Voso offered to pay back Ewton's $500,000 contribution in monthly payments.  (R.28-1, Voso Aff. ¶ 103).  Ewton declined.  (R.17, Answer ¶ 23 ("Teresa and Rick turned that offer down, because it would not make Defendants whole")).  The parties nonetheless continued their negotiations.

Meanwhile, in August 2015, non-party Richard Flynn contacted attorney Michael Lightfoot about a proposed business for which Flynn had already secured a $150,000 loan from a personal contact, Louise Graff ("Graff").  (R.16-2, Flynn Aff. ¶¶ 4-6).  According to Flynn, during an August 12, 2015 meeting, Voso pitched Flynn, convincing him to invest Graff's money in Pursuit based on fraudulent business projections (including a $5 million valuation) and partnerships with Dollar General, Walmart, and Magic Johnson.  (*Id.* ¶¶ 7-27; 3/11 Flynn Hearing Testimony at 95-97, 107).  Lightfoot denies this August 12 meeting ever occurred, and denies having a role in preparing related materials and/or valuation reports.  (R.28-14, Lightfoot Aff. ¶¶ 15-16, 20-21).  Voso also denies this meeting.  (R.28-1, Voso Aff. ¶¶ 115-17).

Documents reflect that Voso and Flynn met during August 2015 and exchanged financial information.  (Defs.' Ex. 71, 63, 64, 53).  According to Flynn, he negotiated with Voso for a position as Pursuit's Chief Financial Officer, along with a salary, a $10,000 "signing bonus," and 10% earned equity interest based on his fundraising efforts.  (R.16-2, Flynn Aff. ¶¶ 28-36; 3/11

---

[10]  The affidavit of non-party Richard Flynn also alleges threatening, harassing, and erratic behavior on the part of Voso.  (R. 16-2, Flynn Aff. ¶¶ 45-50; *see also* Defs.' Ex. 60).

Flynn Hearing Testimony at 108-09, 225-28).  Flynn testified, however, that he obtained an immediate 10% equity interest in Pursuit because business lenders required him to guarantee Pursuit loans, in one instance offering his home as collateral.  (3/11 Flynn Hearing Testimony at 109-10; *see also* R.16-2, Flynn Aff. ¶¶ 52-58).  To that end, Defendants introduced into evidence several loan applications reflecting Voso's 90% ownership interest in Pursuit, along with Flynn's 10% interest.  (Defs.' Exs. 7, 9, 11).

Voso, however, disputes Flynn's 10% ownership status.  He states that the operating agreement purporting to give Flynn a 10% membership interest is a forgery, with a photoshopped signature and a falsified membership schedule.  (R.28-1, Voso Aff. ¶¶ 128-31; Defs.' Ex. 36).  Voso offers the affidavit and testimony of a forensic document examiner, Warren Spencer, averring the same.  (R.30, Spencer Aff. ¶¶ 13-14 (examining R.17-7 and production document bates-stamped EWTON000376-414)).  Flynn, on the other hand, testified that he "was in front of Mr. Voso when [Voso] signed the document."  (3/11 Flynn Hearing Testimony at 112-13).  Even without Mr. Spencer's affidavit and testimony, however, the Court notes that the signature in question appears to be a precise overlay of Voso's authentic signature, rather than an authentic signature itself.  In addition, the membership schedule reflecting Flynn's 10% interest contains inconsistent formatting and misspellings, unlike the genuine, undisputed operating agreements contained in the record.  These features call into serious question the authenticity of this document.  As such, the Court will not rely on it in connection with this ruling.

Nevertheless, Voso still acknowledged that he signed business loan applications representing Flynn as a 10% owner.  (3/29 Voso Hearing Testimony at 456-64 (further testifying that he "retracted" certain applications)).  In at least one instance, a lender funded and deposited

a $30,000 loan in Pursuit's account on the basis of this falsified ownership information. (*Id.* at 462-64; *see also* Defs.' Exs. 11 and 12).[11] These loan applications, dated from September and October 2015, do not reflect any ownership interests for Ken Frank, Ewton, or Smith. (*See* Defs.' Exs. 7, 9, 11). According to Flynn, Voso did not tell him that there *were* other members of Pursuit. (R.16-2, Flynn Aff. ¶¶ 42-44).[12] Documents, however, belie Flynn's testimony. On August 19, 2015, for example, Flynn sent a text message to Voso, stating that he was "thinking about the 20% owner" and proposing an idea to make it look, on paper, "like [the 20% owner] is not part of the company." (Pls.' Ex. 36). Voso also copied Flynn on an e-mail dated September 29, 2015, which noted the existence of "current equity partners" and attached the May 2015 Operating Agreement reflecting Ewton, Ken Frank, and Smith as members. (Pls.' Ex. 22).

In addition to applying for loans, Flynn also facilitated investments on Voso's behalf. Specifically, he sent financial information to Mr. Michael Wilson ("Wilson"), who eventually invested $100,000 in Pursuit. (3/11 Flynn Hearing Testimony at 129-32, 139). Flynn testified that Voso did not permit him to transmit certain financials -- specifically ones reflecting all outstanding loans and payables. (*Id.* at 131; Defs.' *see also* Ex. 17). Neither Flynn nor Voso "talk[ed] with Mr. Wilson about the real financial condition of Pursuit Beverage before [Wilson] invested his money." (3/11 Flynn Hearing Testimony at 131). Voso also copied Flynn on e-mails to Rusty Seifert ("Seifert") and Clint Lohman ("Lohman"), sole member of a limited

---

[11] This testimony is inconsistent with Voso's affidavit, which denies any involvement with Flynn in the loan application process. (R.28-1, Voso Aff. ¶¶ 122-27).

[12] Flynn avers that he also later discovered that Lightfoot and Friedman received a 5% equity share for facilitating the $150,000 Graff investment. (R.16-2, Flynn Aff. ¶ 19). Lightfoot denies this ownership interest. (R.28-14, Lightfoot Aff. ¶ 9 ("I am not involved in any financial matters of Pursuit in any way")). The November 1, 2015 membership schedule, however, indicates a 4.649% interest held by Lightfoot & Friedman. (Defs.' Ex. 5, Amended and Restated Operating Agreement (the "November 2015 Operating Agreement") at Schedule 1).

liability company called Liquid Energy. (R.28-1, Voso Aff. ¶¶ 106-111, 121; Pls.' Ex. 22, Sept. 29, 2015 e-mail from Voso to Seifert). According to Voso, Lohman is a "very savvy businessman" with an impressive investment portfolio. Seifert is Lohman's "right-hand man." (3/29 Voso Hearing Testimony at 354-55). Voso eventually negotiated an equity investment from Liquid Energy. (R.28-1, Voso Aff. ¶¶ 147-49).

Before the Liquid Energy deal closed, however, Pursuit needed additional funds. (Defs.' Ex. 71, Oct. 9, 2015 message from Voso to Flynn ("We funding today bro? We have to")). Voso asked Flynn to apply for a merchant ACH loan while Voso was at a conference in Las Vegas on October 9, 2015. (3/11 Flynn Hearing Testimony at 132-39). Voso now claims that Flynn forged his name on certain loan documents, dated October 9, 2015. (R.28-1, Voso Aff. ¶¶ 136-37). Voso's forensic document examiner averred the same. (R.30, Spencer Aff. ¶ 15 (examining R.16-4)). Flynn, on the other hand, testified to his "belief" that Voso signed those documents. (3/11 Flynn Hearing Testimony at 235-37 (examining Pls.' Ex. 7)). The Court notes that the signature in question does not appear to be Voso's, based on its review of other, undisputed signatures contained in the record.

Setting this issue aside, there is no dispute that Voso gave Flynn access to Pursuit's Chase bank account to put together a loan package on October 9, 2015. (3/11 Flynn Hearing Testimony at 132-39; 3/29 Voso Hearing Transcript at 411). Voso testified that he only authorized Flynn to access Pursuit's Chase bank statements for July, August, and September 2015. (3/29 Voso Hearing Transcript at 410-12). Flynn, instead, accessed Pursuit's corporate accounts and Voso's personal accounts, as well as Pursuit's accounting software, Sage 50, using Voso's computer. (3/11 Flynn Hearing Testimony at 132-39; *see also id.* at 175-76). Voso asserts that Flynn "stole hundreds of files from [his] computer on October 9," including

"financial data . . . customer lists, recipes, and other proprietary and trademarked material."

(R.28, Response Br. at 6; R.28-1, Voso Aff. ¶¶ 133-35, 138-46).

Voso attributes Flynn's conduct to "side discussions with [Ken] Frank, Rick Frank, and Ewton in early October 2015." (R.28-1, Voso Aff. ¶¶ 114, 132, 154-55; *see also* R.28-12, Brooksy Smith Aff. ¶¶ 12-23 (corroborating Flynn's conversations with Rick Frank)). Flynn, on the other hand, felt that it was his duty as CFO to take the financial records in order "to protect the company . . . to protect the members." (3/11 Flynn Hearing Testimony at 139-40; *see also* R.16-2, Flynn Aff. ¶¶ 60-63). Flynn ultimately gave these financial records to Defendants' attorneys at Holland & Knight, "who in turn gave those records to Bennett Kaplan and Amanda Krauss at Axium Consulting." (R.16-2, Flynn Aff. ¶ 74). Flynn testified that he also went "to the authorities with all the information." (3/11 Flynn Hearing Testimony at 140).

Meanwhile, Voso and Defendants continued negotiations over their equity stake dispute throughout October 2015. According to Rick Frank, "every time we went to settle, there was an emergency. Something else was going on that [Voso] couldn't ever come up with the money." (3/11 Rick Frank Hearing Testimony at 32-33). Voso, in turn, claims that the parties reached an agreement in principle to resolve the dispute in October 2015, but the deal fell apart after Ewton's attorney proposed an anti-dilution provision. (R.28-1, Voso Aff. ¶¶ 105-06, 111-13).[13]

---

[13] Counter-Plaintiffs claim that Voso improperly diluted their membership interests by giving equity to other investors without their knowledge or consent, including 1% to Dr. Fred Loe, 1% to Wilson, and 12% to Lohman. (R.17, Counterclaims ¶¶ 191-204; R.17-10, Schedule 1 to the November 2015 Operating Agreement (reflecting Voso, Ewton, Frank, Loe, Lightfoot & Friedman, Smith, and Liquid Energy as members)). Voso testified that he diluted his own shares even though the Operating Agreement did not require him to do so. (3/29 Voso Hearing Testimony at 385-86).

According to Voso, he scheduled a meeting with Lohman on November 18, 2015 to discuss Liquid Energy's investment.  (*Id.* ¶¶ 147-49).[14]  After learning that Flynn, Ken Frank, and Rick Frank planned to "storm the castle" and oust him from management at the meeting, however, he directed Pursuit's attorneys to terminate Flynn and Ken Frank's employment.  (*Id.* ¶¶ 150-52; *see also* R.28-12, Brooksy Smith Aff. ¶¶ 24-31 (corroborating the "storm the castle" plan); R.28-14, Lightfoot Aff. ¶¶ 23-24 (same); R.16-1, Ken Frank Aff. ¶ 100 (acknowledging his November 17, 2015 termination); R.16-2, Flynn Aff. ¶¶ 81-82 (same)).

After Ken Frank's termination, Pursuit continued to issue business correspondence to Ewton and Ken Frank as members.  (*See, e.g.*, Defs.' Ex. 4 and 5 (Nov. 20, 2015 Notice to Members of Record, attaching November 2015 Operating Agreement); Defs.' Ex. 38 and 39 (Dec. 3, 2015 Notice of Meeting of Members and Dec. 16, 2015 Postponement Notice)).  Voso admitted at the hearing that Ewton and Ken Frank are members of Pursuit.  (3/29 Voso Hearing Testimony at 361-62 ("They're members; yes, sir")).[15]

According to Voso, Pursuit's 2015 revenues totaled approximately $2.1 million, translating into a net operating loss of $100,000.  (*Id.* at 351-52).  As of March 29, 2016, Pursuit's year-to-date gross sales had decreased by 8%.  (*Id.*).  Voso testified that "sales have been a little flat through the first quarter [2016]" because of "[t]his proceeding. The team has been distracted . . . with everything that's been going on." (*Id.*).  Voso further testified that, by April 2016, Pursuit will institute regular membership meetings and payroll, and will produce

---

[14]  According to the November 2015 Operating Agreement, Lohman is the largest minority member of Pursuit.  He objects to the appointment of a receiver and has submitted an affidavit declaring his "faith in Voso and [Voso's] management of Pursuit."  (R.28-11, Lohman Aff. ¶¶ 7-9).
[15]  Voso also testified to this effect at his deposition.  (R.35-1, Voso Dep. Tr. at 41-42, 58-60).

Pursuit's books and records to its new accounting firm for quarterly reviews.  (*Id.* at 358, 361, 499).

### F.    The Pleadings

After a failed settlement offer in December 2015, (Pls.' Ex. 4), Voso filed his Complaint in January 2016.  Voso seeks "clarity" as to the membership status of Ewton and Ken Frank. (3/29 Voso Hearing Testimony at 372-73).  His Complaint alleges that Defendants undermined Pursuit's business and "embarked upon a course of conduct designed to steal Pursuit's growing business for themselves . . . including beverage formulas, customer names and requirements, deal terms, pricing data, vendor names and contract terms, and similar highly-sensitive commercial and business information."  (R.1, Compl. ¶¶ 18-23).  Voso seeks a declaration with respect to the ownership and management of Pursuit (Count I), and other injunctive relief (Count II).  He also alleges a violation of his rights under the Operating Agreement and the Illinois Limited Liability Company Act (Count III), and under the Computer Fraud and Abuse Act (Count IV).  In addition, he includes a conspiracy claim (Count V).

Defendants deny these allegations and counterclaim—along with Smith—for violations of the Illinois Limited Liability Company Act, fraud, breach of fiduciary duty, unjust enrichment, an accounting, and a demand for records.  (R.17).

## II.    Management of Pursuit's Assets

In support of their motion, Counter-Plaintiffs offer purported evidence of fraud and mismanagement warranting receivership appointment.  The Court addresses each category of evidence in turn.

A. **Improper Disbursements**

First, Counter-Plaintiffs offer the testimony of Amanda Krauss, an employee of Axium Consulting. Based on the financial information Flynn obtained from Voso's computer, Krauss performed a cash analysis of Pursuit's financial records from July, August, and September 2015, relying upon bank statements, check registers, and a document prepared by Flynn based on his own cash flow analysis. (3/11 Krauss Hearing Testimony at 250-52). She also interviewed Flynn. (*Id*). Krauss is an independent third party. During the hearing, however, the Court granted Voso's request to strike the Krauss affidavit on hearsay grounds. The Court relies, therefore, on Krauss' oral testimony.

Based on her review, Krauss observed 18 cash withdrawals by Voso in a three-month window, totaling $11,675. (*Id.* at 255). She further observed 14 transfers into Voso's personal checking account, as well as "transactions totaling $33,278 that may represent potential personal spending," including payments for automobiles, Amazon, separate credit cards, meals, Stub Hub, and a nightclub. (*Id.* at 255-59).[16] Lastly, Krauss observed "that there was $21,400 transferred during this three-month time window to five specific individuals" – Dayna, Aslan, Ronnie, Voso's daughter, and Voso's friend. (*Id.* at 259-60).[17] Krauss did not examine the terms of any Pursuit operating agreement in her analysis. (*Id.* at 267, 270).

Counter-Plaintiffs also introduced exhibits showing these personal transfers, and elicited testimony that these transfers, among others, resulted in overdrafts of Pursuit's account. (Defs.' Ex. 22, 51, 53-55; 3/11 Flynn Hearing Testimony at 245-47). Counter-Plaintiffs further

---

[16] *See also* R.16-2, Flynn Aff. ¶¶ 68-73 (reaching similar conclusions about "what appears to be personal spending").

[17] Krauss did not offer any opinion on the propriety of any transaction. (*Id.* at 263).

introduced evidence showing that Voso had used Pursuit funds to pay off Pursuit Energy's outstanding credit card bill.  (3/29 Voso Hearing Testimony at 517).

In response, Voso testified that the operating agreement which he believes is in effect entitles him to a manager's salary of $200,000, as well as $60,000 in automobile, health care, and intellectual property allowances.  (3/29 Voso Hearing Testimony at 356-57).  Voso admitted that he did not receive a regular salary, but rather took money from Pursuit's accounts as needed, either through ATM withdrawals or personal transfers.[18]  (*Id.* at 357-58).  He testified that his total 2015 compensation was "not $260,000."  (*Id.* at 500).

Voso further testified that payments to his ex-brother-in-law, ex-wife, and current girlfriend were "all part of [his] compensation," but he did not know if he paid taxes on that compensation.  (*Id.* at 444-48).  With respect to Dayna, in particular, Voso further stated that she received a portion of his Pursuit royalty interests "pursuant to a divorce decree," but on cross-examination, he admitted that the divorce decree does not mention or require any such assignment of royalties.  Rather, the loan agreement between Dayna and Pursuit provided for royalty payments, in consideration of her contributions to Bomb Energy and Pursuit Energy.  (*Contra* R.28, Response Br. at 9 and 3/29 Voso Hearing Testimony at 440 *with* Defs.' Exs. 66 and 68 and 3/29 Voso Hearing Testimony at 450-52).

---

[18]  Voso likewise testified at his deposition that—under the purported authority of the operating agreement—he used Pursuit funds for health and life insurance, various car and motorcycle payments, promotional items and events, trade shows, payments to his personal contacts, licensing and vendor fees, legal and accounting fees, office expenses, company dinners, various commissions, a Netflix subscription, and travel expenses.  (R.35-1, Voso Dep. Tr. at 123-76).  He testified that he improperly recorded some of these expenses.  (*Id.*).  He avers, however, that his "compensation and allowances [for July through September 2015] were far less than those authorized under the Operating Agreement."  (R.28-1, Voso Aff. ¶ 153).

### B.  Increased Liabilities

#### 1.  Commercially Unreasonable Transactions

Counter-Plaintiffs also claim that Voso has signed "at least ten separate high interest short term financing loans on behalf of Pursuit" which carry "commercially unreasonable interest rates and fees." (R.16-2, Flynn Aff. ¶ 72; *see also* 3/11 Krauss Hearing Testimony at 260-61).[19] According to Voso's forensic accountant, however, these short-term financing contracts are common for start-up companies, were "necessary to fund Pursuit's cash flows," and will end in May 2016.  (R.28-9, Pakter Aff. ¶¶ 13-14).  Voso likewise testified that high-interest ACH loans are "unfortunately . . . necessary in this type of business."  (3/29 Voso Hearing Testimony at 384-85).

#### 2.  Debt Liabilities

Voso testified that Pursuit has five outstanding debts – the $150,000 Graff loan,[20] a $90,000 note from Wilson, a $100,000 loan from Dr. Loe, and two ACH lines of credit which Pursuit pays down daily.  (3/29 Voso Hearing Testimony at 352-54, 384).  He testified that Pursuit is not "currently in default of any loan," has never been sued by a lender, and has never been declared in default by any lender.  (*Id.* at 353, 384).

On cross-examination, however, Voso testified that Pursuit is "not current" on the loans extended by his personal contacts, Mahmoud Babikir ("Babikir") and Anup Patel ("Patel").  (*Id.*

---

[19]  Flynn further testified that Voso did not list Pursuit's ACH loans on financial statements given to potential investors, because Voso had personally guaranteed them.  (3/11 Flynn Hearing Testimony at 106-07).

[20]  Counter-Plaintiffs allege that Pursuit is in current default of the Graff loan.  (R.17-8, Graff. Aff. ¶ 4; R.16-2, Flynn Aff. ¶¶ 77-80).  Voso, on the other hand, claims that he mailed Graff the required monthly payment.  The payment was returned as undeliverable.  (R.28-1, Voso Aff. ¶ 120; R.35-1, Voso Dep. Tr. 105-107; R.31, Aff. of Non-Service; *see also* 3/11 Copenharve Hearing Testimony at 281-82).

at 468-71; *see also* Defs.' Exs. 47 and 48).[21]  In addition, Counter-Plaintiffs offer evidence concerning an unexplained payable owing to Pursuit contractor Jim Donahoe (Defs.' Ex. 13), and an unpaid royalty fee owing to Ewton (Defs.' Ex. 16).  They further offer the affidavit of non-party Alec Shankman, averring that Pursuit is in current default of a promotion contract involving the television show, Swamp People.  (Defs.' Ex. 38).  Lastly, Counter-Plaintiffs argue that "on October 9, 2015, Voso and American Funding, LLC entered into a Confession of Judgment related to another debt that Pursuit did not pay."  (R.16, Opening Br. at 4-5; R.16-4, Confession of Judgment).  Voso, however, states that Pursuit paid this loan in full.  (R.28, Response Br. at 5-6).

### 3.    Mossy Oak Licensing Agreement

The parties agree that the Mossy Oak Licensing Agreement is Pursuit's most valuable asset.  (R.16, Opening Br. at 4; R.28-1, Voso Aff. ¶ 82).  Flynn claims, however, that Voso "intentionally underpays" Mossy Oak's royalty payments, putting Pursuit at risk of a contract breach.  (R.16-2, Flynn Aff. ¶¶ 64-65).  Counter-Plaintiffs further look to bank statements reflecting that Pursuit made its minimum quarterly royalty payments to Mossy Oak throughout 2015, but did not pay additional royalties based on sales, as required under the contract.  (R.35, Reply Br. at 13).  Voso denies this underpayment.  (R.28-1, Voso Aff. ¶ 81).  The Court cannot determine, on the basis of the record before it, what additional payments, if any, were due under the Mossy Oak Licensing Agreement in 2015.[22]

---

[21]  Voso further testified to his history of defaulting on personal loans.  (3/29 Voso Hearing Testimony at 471-73).

[22]  Counter-Plaintiffs acknowledge that Voso spoke in terms of "revenue" when testifying that Pursuit was a $2.1 million business, whereas the Mossy Oak Licensing Agreement speaks in terms of percentages from the "wholesale sales price."  (R.28-2, Mossy Oak Licensing Agreement at Schedule A).

Voso further avers that if the Court appoints a receiver, "Mossy Oak will unilaterally and immediately terminate the license agreement with Pursuit." (R.28-1, Voso Aff ¶ 156). Indeed, the Licensing Agreement provides that Mossy Oak "may unilaterally and immediately terminate this Agreement . . . should a receiver or trustee be appointed to take possession of a substantial part (50% or more) of the assets of [Pursuit]." (Defs.' Ex. 42 at § 8.4). Although both parties attempted to introduce hearsay evidence regarding Mossy Oak's position on this issue, the Court refused to admit such evidence for the truth of the matter.

### 4. Potential Legal Liabilities

Counter-Plaintiffs also claim that Voso has subjected Pursuit to "unnecessary" legal liabilities, such as those associated with wrongful termination,[23] threatening the use of a firearm against employees, statutory misclassification of employees, and other tax issues relating to Voso's compensation. (R.16, Opening Br. at 4, 6-7; R.35, Reply Br. at 6-7). Counter-Plaintiffs further assert that, as a general matter, Voso has falsified financial information and has abdicated his duty to ensure proper recordkeeping.

### C. Insolvency Risk

Counter-Plaintiffs set forth evidence, based on Krauss' forensic categorization, that Pursuit ran a cash flow deficit of $205,802 during the period July 1 – September 30, 2015. (3/11 Krauss Testimony at 261). Krauss did not know about Pursuit's business performance in any other quarter of 2015. (*Id.* at 271). Voso, in turn, sets forth evidence that, for the period January

---

[23] Counter-Plaintiffs identify Williams as someone who may have a case against Voso for unlawful disability discrimination. (R.16-1, Ken Frank Aff. ¶¶ 94-99). Voso testified that he fired Williams—at the Frank brothers' suggestion—for performance issues and to hire Rick Jr. and Mark Baines instead. (3/29 Voso Hearing Testimony at 380; *see also* R.28-1, Voso Aff. ¶¶ 65, 68-70). Williams' affidavit, however, faults Voso -- not the Franks. (Defs.' Ex. 42).

1 – December 31, 2015, Pursuit's revenues exceeded its expenses by $198,000, and its assets exceeded its liabilities by more than $1.8 million. (R.28-9, Pakter Aff. ¶ 16).

Voso testified that Pursuit's cash flow is "nearing break-even" as of March 29, 2016. (3/29 Voso Hearing Testimony at 362). Pursuit's general ledger for March 2016 reflects this cash flow situation. (R.62-2). According to Voso, Pursuit does not have the funds to pay for a receiver. (3/29 Voso Hearing Testimony at 363). The Court recently approved Voso's authority to enter into a merchant loan for $75,000 to cover operational expenses. (R.77, R.80).

## ANALYSIS

I.     **Standing**

Voso first challenges Counter-Plaintiffs' standing to seek a receivership over Pursuit. Litigants with no property interest in the subject entity "do not have standing to seek or obtain appointment of a receiver over that entity." *Miller*, 2010 WL 5095812 at *9. Here, the record reflects that Rick Frank has no interest in Pursuit, either as a creditor or an equity investor.[24] He thus has no standing to seek a receivership. Smith, on the other hand, is an undisputed equity investor with standing.[25]

As to Ewton and Ken Frank, Voso argues that the Court should not assume jurisdiction over their receivership claims, given their disputed equity stake in Pursuit. (R.28, Response Br. at 4). The evidence in the record, however, demonstrates that they are more than simple contract creditors. (R.36-2, Second Investment Agreement, at § 3; R.28-5, May 2015 Operating Agreement, at Schedules 1 and 2). Indeed, even Voso admitted during his testimony that they

---

[24] Counter-Plaintiffs, themselves, only argue "that Teresa, Ken, and Matt are Pursuit members." (R.35, Reply Br. at 2, 4).
[25] Voso argues that the claims of Smith, a "less than 1% minority member of Pursuit," cannot warrant receivership protection. (R.28, Response Br. at 4 n.2). But Voso's argument goes to the merits of a receivership under these circumstances -- not standing.

are members of Pursuit. (3/29 Voso Hearing Testimony at 361-62 ("They're members; yes, sir")). In light of the evidence concerning Voso's treatment of Ewton and Ken Frank as Pursuit members through at least December 2015—including (i) Voso's unequivocal hearing and deposition testimony, (ii) tax forms, (iii) business correspondence, and (iv) personal correspondence—the Court holds, for purposes of this motion, that Ewton and Ken Frank have standing to seek a receivership.

## II. Receivership

### A. Fraud and Mismanagement of Pursuit Assets

"[A] prima facie showing of fraud and mismanagement is enough to call into play the equitable powers of the court to appoint a receiver." *Tcherepnin v. Kirby*, 416 F.2d 594, 597 (7th Cir. 1969). Counter-Plaintiffs have made a prima facie showing. Voso's management history— including a track record of involuntarily dissolved LLCs, a personal bankruptcy, and questionable spending practices at Pursuit Energy (*see* Defs.' Exs. 23, 8, and 14)—raises red flags as to Voso's management practices at Pursuit. Further evidence suggesting mismanagement includes documents and testimony that Voso has signed off on misleading business loan applications, has engaged in unsettled tax practices, has declined to pay out on contractual obligations, and has recompensed himself through ATM withdrawals and personal transfers, rather than through a payroll salary.

The Court notes, however, the breadth of authority afforded to Voso as Managing Member under the terms of Pursuit's operating agreement -- regardless of whether the December 2014 Operating Agreement, the May 2015 Operating Agreement, or the November 2015 Operating Agreement controls. This authority distinguishes Voso from the manger whose unauthorized conduct caused the *Miller* court to appoint a full receivership. *See Miller*, 2010

WL 5095812 at *7 n.11 ("It appears that Rudy uses Up In Smoke as a vehicle to facilitate and fund his own business pursuits with virtually no recognition that he is not a shareholder or that Miller and Charlotte have equal shares"). Counter-Plaintiffs fail, for example, to identify any authority—statutory or otherwise—precluding the manner in which Voso currently takes his compensation. While the Court recognizes that his method of paying himself is troubling, the circumstances here do not rise to the level of warranting the harsh and extraordinary measure of a full receivership. *See Connolly*, 162 F.2d at 435.

Ultimately, the Court looks to the extensive record evidence suggesting that Voso has failed to maintain corporate formalities, including books and records. In particular, different documents reflect different members and different payables – some in consideration of loans made to different corporate entities. (*Compare, e.g.*, Ex. Defs.' Ex. 5 *with* Defs.' Ex. 53). Voso's testimony that he does not know which Pursuit financial statement is "accurate," or "where those numbers came from," (3/29 Voso Hearing Testimony at 428-29, 455), weighs in favor of receivership appointment. The Court finds it questionable that Voso cannot identify such financial information.

### B. Imminent Risk of Property Injury

Counter-Plaintiffs next argue that, "if Voso is not replaced by receiver, there is a significant probability that Pursuit will be forced to dissolve." (R.16, Opening Br. at 5). The evidence reflects that Pursuit has operated at a net loss, that Voso has overdrawn the Pursuit bank account at times, that Voso has disregarded known payables at times, that Voso has exposed Pursuit to unquantified potential tax and legal liabilities, and that Pursuit's current cash flow is "nearing break-even." Although this evidence does not necessarily signify that Pursuit is in imminent danger of dissolution so as to "justify the 'extraordinary' remedy of imposing a

receivership," *Jackson v. N'Genuity Enterprises*, No. 09 C 6010, 2010 WL 3632515, at *2 (N.D. Ill. Sept. 9, 2010), Counter-Plaintiffs have made a showing of routine asset mismanagement and the risk of Pursuit defaulting on current obligations. Pursuit's poor recordkeeping exacerbates this risk and weighs towards receivership. *Miller*, 2010 WL 5095812 at *7.

### C.  No Adequate Remedy at Law

Counter-Plaintiffs further argue that they will have no ability to collect a monetary judgment if Pursuit dissolves as a result of Voso's behavior. In response, Voso points to the Counter-Plaintiffs' counterclaims as constituting adequate legal remedies. Voso ignores, however, the risk of interim property injury should Voso continue to manage Pursuit as he has, unfettered by any form of judicial oversight. *See JPMorgan Chase Bank*, 2007 WL 2608827 at *10. Contrary to Voso's suggestion, moreover, the Court has already determined that Ewton, Frank, and Smith have property interests meriting receivership protection. This factor favors receivership.

### D.  Relative Harms

The Court next weighs the balance of harms should it appoint a full receiver. Counter-Plaintiffs reason that replacing Voso with a third-party manager will benefit him and all other members of Pursuit. Voso, on the other hand, points to the risk that Mossy Oak may terminate the Licensing Agreement—Pursuit's most valuable asset—should this Court appoint a receiver. (*See* Defs.' Ex. 42 at § 8.4 (Mossy Oak "may unilaterally and immediately terminate this Agreement . . . should a receiver or trustee be appointed to take possession of a substantial part (50% or more) of the assets of [Pursuit]"). This risk weighs against receivership. *See Maher v. Rowen Grp. Inc.*, No. 12 C 7169, 2013 WL 5995425, at *5 (N.D. Ill. Nov. 12, 2013). The Court further notes Voso's suggestion that he enjoys working relationships with certain of Pursuit's

investors and lenders (including Lohman, Babikir and Patel), as well as with vendors, customers, and suppliers in the beverage industry -- relationships which a third-party receiver may not enjoy. This, too, weighs against receivership. *See id.* Further, the Court recognizes that receivership is a "drastic and expensive remedy[.]" *Miller*, 2010 WL 5095812 at *8.

At the same time, however, the Court notes that Pursuit (and its members) cannot afford Voso transferring corporate funds on a whim, making payments from Pursuit's funds that are unrelated to Pursuit's business, taking on avoidable high-interest financing contracts, underpaying or delaying payment on current obligations (including the Mossy Oak Licensing Agreement), engaging in questionable tax practices, and failing to maintain proper books and records. Considering all testimony and evidence, and weighing the relative harms, the Court finds that a full receivership is not warranted here. The circumstances do, however, warrant the institution of more limited remedial measures, as discussed *infra*.

E. **Sufficient Likelihood of Prevailing on the Merits, and the Necessity of a Receiver to Prevent Irreparable Injury**

The Court views as neutral (i) Counter-Plaintiffs' likelihood of success on the merits and (ii) the necessity of a receiver to prevent irreparable injury. Voso has filed a motion to dismiss all counterclaim counts on the grounds of standing, ratification, and failure to state a claim. (R.48). The Court will not determine these issues without the benefit of full briefing. The Court notes, however, Counter-Plaintiffs' apparent failure to review, sign, or negotiate any written instrument concerning their equity arrangement—or to conduct any due diligence on Voso— before making their large financial investments. This failure may have consequences on the success of their counterclaims. Further, the evidence does not compel the conclusion that Voso's continued management will result in imminent and irreparable injury to Pursuit, especially in light of the remedial measures discussed *infra*.

## III.    Interim Remedial Measures

Considering all testimony and evidence, the Court finds that this case does not qualify for the "drastic, harsh and dangerous" remedy of a full receivership.  *Connolly*, 162 F.2d at 435. The Court thus denies Counter-Plaintiffs' motion to appoint Kaplan as a full receiver with day-to-day operational control over Pursuit.  (R.14).  In exercise of its equitable powers, however, the Court hereby directs Counter-Defendants to institute the following ancillary measures pending this litigation.

First, the Court requests an independent audit of Pursuit's books and records, and an accounting of all assets and liabilities, including tax liabilities.  If the parties cannot agree on an auditor by April 19, 2016, each side should submit two names of potential auditors to the Court. The selected auditor shall report to the Court, and to the parties, at regular intervals throughout the audit and upon completion of the audit.  Voso shall give the auditor access to all requested materials.  Second, the Court preserves its existing order that Pursuit may not obtain loans without court approval,[26] and Pursuit may not expend company funds for non-business purposes. (R.20).  Third, Pursuit must inform the Court of the identity of all its individual or entity investors moving forward.  Fourth, the Court directs that Pursuit institute payroll and that Voso take, as compensation, a regular, annualized salary.  Voso may not continue to pay himself sporadically and through transfers to his family members and friends, as he has done in the past. This order remains subject to change.

---

[26]  This order does not prevent Pursuit from obtaining additional investments or entering into normal business contracts, as permitted by applicable law and governing documents.

## CONCLUSION

For the foregoing reasons, the Court denies Counter-Plaintiffs' motion.[27]  The Court directs Counter-Defendants, however, to institute the stated remedial measures pending this litigation, effective immediately.

**Dated:**   April 12, 2016                                    ENTERED

_AMY J. ST. EVE_
AMY J. ST. EVE
United States District Court Judge

---

[27]  Given the resolution of this motion, the Court does not address Voso's argument that Ewton must arbitrate her claims.  (R.28, Response Br. at 15).